In re Barbara LOCHIATTO, Appellant.

In re Patrick LOCHIATTO, Appellant.

In re John E. DUNN, Appellant.

Nos. 74–1096, 74–1097, 74–1102.

United States Court of Appeals,
First Circuit.

Heard April 4, 1974.

Decided May 31, 1974.

Henry D. Katz, Boston, Mass., for Barbara Lochiatto and others, appellants.

Lawrence C. Weisman, Boston, Mass., for John E. Dunn, appellant.

Joel M. Friedman, Sp. Atty., U. S. Dept. of Justice, with whom James N. Gabriel, U. S. Atty., and Gerald E. McDowell, Sp. Atty., U. S. Dept. of Justice, were on brief, for appellee.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

█ The appellants were held in contempt after refusal to answer questions proposed before a special grand jury investigating the making and financing of extortionate credit transactions.[1] When first brought before the grand jury each witness refused to testify, invoking his or her Fifth Amendment right to avoid self-incrimination. They were then separately brought before district courts where the United States Attorney applied for "use" and "derivative use" immunity. 18 U.S.C. §§ 6002, 6003. Although the courts granted the immunity sought by the government[2] and in-

---

1.- The United States grand jury was investigating possible violations of 18 U.S.C. §§ 892–894.

2. The Lochiattos also challenge the trial court's refusal to consider the propriety of a grant of immunity in their case. We affirm the district court's ruling on this point. The language of 18 U.S.C. §§ 6003, 6004 is in relevant part of substantially the same import as the statutory language examined in Ullmann v. United States, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956), where the court stated in response to an identical claim, "[A] fair reading of [the statute] does not indicate that the district judge has any discretion to deny the order on the ground that the public interest does not warrant it." *Id.* at 432–433. This reasoning has been applied to §§ 6003, 6004 in In

formed the witnesses that they would be held in contempt if they continued to refuse to answer questions, they remained recalcitrant when again brought before the grand jury. Dunn answered a few of the questions but refused to respond to those he alleged were the "fruit" of illegal wiretaps. The Lochiattos refused to answer any questions, repeating Dunn's claim and asserting any other legal privileges available to them.

 The government then filed petitions before the district courts and the witnesses became defendants in contempt proceedings. The government admitted the existence of electronic surveillance, 18 U.S.C. § 3504, but asserted that all information gleaned was the product of wiretaps authorized by court order. In the Lochiatto cases the district court refused to examine any of the government documents or the court orders and denied the defendants' motion for their discovery. The court sealed all the documents for appeal, and, rejecting their claim to the husband-wife privilege not to testify,[3] held the Lochiattos in contempt. Their contempt sentences were stayed pending appeal. Dunn's case was treated somewhat differently. The court denied discovery but reviewed in camera the court orders authorizing the wiretaps and found them to be facially sound. It then held Dunn in contempt, 28 U.S.C. § 1826(a). This court stayed the district court order committing Dunn and admitted him to bail pending appeal.

The appellants' central contention in these appeals is that the defendant in contempt proceedings has a right to reasonable disclosure of the court orders, government affidavits, documents, and materials submitted to support the order; disclosure of the products of surveillance or reports to the court; and a plenary evidentiary hearing to determine whether the wiretap orders were granted and surveillance conducted in compliance with statutory and constitutional requirements. Even if they were not entitled to such discovery, the Lochiattos asserted at minimum a right to in camera review of the materials to resolve these issues.

The problem posed by these cases, where the interceptions were pursuant to court order, is that which the Supreme Court declined to examine in Gelbard v. United States, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972).[4] It requires evaluation of conflicting public interests that must be identified and weighed to strike a practicable balance between statutory rights and the efficient administration of the grand jury. The appellants contend that without disclosure they cannot meaningfully assert their combined rights under 18 U.S.C. § 2515 and 18 U.S.C. § 2518(10)(a), which together afford a defense to contempt proceedings where there is wiretap evidence "(i) . . . [which] was unlawfully intercepted; (ii) [where] the order of authorization or approval under which it was intercepted is insufficient on its face; or (iii) [where] the interception was not made in conformity with the order of authorization or approval." The government asserts that plenary evidentiary hear-

---

re Kilgo, 484 F.2d 1215, 1219 (4th Cir. 1973); In re Grand Jury Investigation, 486 F.2d 1013 (3d Cir. 1973).

3. The Lochiattos asserted this privilege generally, that is, to avoid answering any questions. Although a grand jury's subpoena power is limited in some regard and "it may not itself violate a valid privilege, whether established by the Constitution, statutes, or the common law", United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), the privilege is not a general one. It must be asserted as to particular questions.

We take special note of the fact that it cannot be asserted where immunity has been granted and the sole claim is that the testimony of one spouse may be inconsistent with the other, forming the basis for a perjury prosecution arising out of the grand jury testimony. See United States v. Doe, 478 F.2d 194 (1st Cir. 1973). Our ruling is without prejudice to subsequent assertions of the husband-wife privilege as to specific questions.

4. *Id.* at 61 n. 22, and 70 (White, J., concurring).

ings will totally disrupt the progress of the grand jury.

The government's position is that there are no grounds for further investigation once it has offered an affidavit, similar to those presented in these cases, stating that all evidence obtained and from which questions to witnesses were formulated was the product of legal electronic surveillance under court order. The assertion is made that such a statement is sufficient in and of itself to terminate further inquiry under 18 U.S.C. § 2515. It is argued that this conclusion follows logically from decisions holding that if the government denies the existence of any wiretap, there is nothing further before the court to investigate or litigate. In re Evans, 146 U.S.App. D.C. 310, 452 F.2d 1239, 1247 (1971), cert. denied, 408 U.S. 930, 92 S.Ct. 2479, 33 L.Ed.2d 342 (1972). *See* United States v. Alter, 482 F.2d 1016 (9th Cir. 1973); United States v. Fitch & Meisel, 472 F.2d 548 (9th Cir. 1973).

■ Section 3504, however, merely states that upon a claim of "a party aggrieved that evidence is inadmissible because it is the primary product of an unlawful act or because it was obtained by exploitation of an unlawful act, the opponent of the claim shall affirm or deny the occurrence of the *alleged unlawful act*." [Emphasis added.] But it is not the function of the adversary to make ultimate legal decisions; it is the function of the court. Nothing in the statute points to any change from this normal allocation of functions. Indeed the statute points to standards customarily applied by judges.[5]

■ Since we find no basis in the statute for concluding that prosecutorial say-so is a sufficient guarantee of lawfulness, we must probe further. Title 18 U.S.C. §§ 2515 and 2518 are among the "laws of the United States" regulating use of electronic surveillance. In our recent decision, In re Marcus, 491 F.2d 901 (1st Cir. 1974), we examined the ruling in Gelbard v. United States, *supra*, which established that § 2515 and § 2518 were tied to one another to the extent that a witness who is recalcitrant before a grand jury and is then faced with contempt proceedings may defend on the basis of § 2518(10)(a). We also indicated that although *Gelbard* did not deal with the problem of court authorized surveillance we faced in *Marcus* and must again examine here, it indicated that the relationship between the two sections existed independently of the particular facts. We held that although § 2518(10)(a) gives no standing to a prospective grand jury witness to be heard on a motion to supress,[6] § 2515 allows such a witness to assert, in defense of a contempt proceeding, the grounds enumerated in § 2518(10)(a)(i), (ii), (iii) which we have previously set forth.[7]

■ Our holding that a contempt witness-defendant has such defenses does not, in this sensitized field of conflicting interests, mean that he has unlimited recourse to means necessary for the maximization of those defenses. Defend-

5. Section 3504(b) states: "as used in this section 'unlawful act' means any act [sic] the use of any electronic, mechanical or other device . . . in violation of the Constitution or laws of the United States or any regulation or standard promulgated pursuant thereto."

6. A witness has no standing to suppress evidence before a grand jury. Cali v. United States, 464 F.2d 475 (1st Cir. 1972).

7. It was at this point in *Marcus* that our theoretical path diverged from that taken by the Second Circuit in In Matter of Persico, 491 F.2d 1156 (2d Cir., 1974). The facts in that case were similar to those now before us. The court held that there was no right in civil contempt proceedings to litigate the legality of court ordered electronic surveillance and that at most a defendant is entitled to in camera inspection of the court order to determine facial validity. The court limited availability of the § 2518 defenses to instances where the government concedes that surveillance was not in conformity with a court order. In reaching this conclusion the *Persico* court placed heavy reliance upon Senate reports. The reasoning of the particular Senate Report relied upon, S.Rep. No.1097, was rejected in other respects in *Gelbard, supra*, 408 U.S. at 60.

ant-appellants argue for the full arsenal. They urge entitlement to a plenary evidentiary hearing with full disclosure in order not only to challenge the validity of the court order on the basis of affidavits submitted but to test the truth of statements made by the affiants. They also seek to obtain the results of the government surveillance and reports thereon submitted to the court to determine if the court-ordered time limits were observed and the authorities "minimized" in accordance with court order. But, just as we have said that defenses are not foreclosed by government assurance that all was legal, so we cannot say that the availability of defenses implies unconditional accessibility to all facts which might be relevant to those defenses.

■ There is often sensitive material contained in the reports and affidavits; there is a high premium placed on secrecy, often to protect the witnesses; there is the practical necessity of not unduly impeding grand jury proceedings. An absolute requirement of total disclosure of this guarded information could not have been the intent of Congress, since the ability of the government to proceed even in the limited circumstances where electronic surveillance is authorized would be severely trammeled. The Supreme Court in United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), indicated that a general rule allowing extensive procedural safeguards would seriously impair the progress of the grand jury with "protracted interruptions of . . . [the] proceedings", Gelbard, supra, 408 U.S. 41, 70 (White, J., concurring), and might "frustrate the public's interest in a fair and expeditious administra-

tion of the criminal law." United States v. Dionisio, 410 U.S. 1, 17, 93 S. Ct. 764, 773, 35 L.Ed.2d 67 (1973).

■ These policy reasons against complete disclosure, however, do not command a bar against any disclosure. Also to be weighed in the scales is the articulated congressional skepticism about electronic monitoring, as an insidious invasion of privacy to be singled out for special scrutiny and safeguards. It is clear from Gelbard that this concern survives passage through grand jury doors. See Calandra, 414 U.S. at 346, 355–356 n. 11, 94 S.Ct. 613. For example, a defendant in contempt proceedings may raise a § 2518(10)(a) challenge to establish that he has "just cause" to refrain from testifying before a grand jury.[8] Certain limited rights are widely recognized.[9] To the extent that the wiretap evidence itself, which is the basis of the questioning of the witness, cannot substitute for the temporary removal of the witness, some delay necessarily follows. But the affected individual has much at stake. To be sure, the threat of incarceration is not inevitable; if the defendant is unsucccessful in his challenge, he may avoid imprisonment by giving testimony. But we read the statutory scheme as giving a witness the right to avoid a Hobson's choice between jail and testimony by mounting at least a limited challenge which, like a declaratory judgment, can clarify his rights before he risks sanction.

The triple objective, then, is to minimize the delay, secure the government's interest, if any, in secrecy, and protect a defendant's right to assert the defenses Congress established. In Marcus we dealt with the only subsection of §

---

8. 28 U.S.C. § 1826(a) expressly limits citation for civil contempt to those cases where a witness "refuses without just cause shown to comply with an order of the court to testify." Gelbard held that a showing that interrogation would be based upon illegal interception of the witness' communications constitutes a showing of "just cause" that precludes a finding of contempt.

9. See the extensive discussion of the procedural requirements ruled applicable in these cases in Harris v. United States, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965); United States v. Alter, 482 F.2d 1016, 1020–1024 (9th Cir. 1973).

2518(10)(a) which by defining the right described the remedy. If a witness should challenge an approval as being "insufficient on its face", the means for challenge were at hand—an inspection of the face. This was a simple task in *Marcus*; facial viewing by the court would have been sufficient to demonstrate facial validity or invalidity. We therefore held that § 2518(10)(a) did not permit evidentiary examination to determine whether Will Wilson was specifically designated or did in fact properly authorize the application, if it appeared so. Unlawfulness and non-conforming interception under subsections (i) and (iii) have no such built-in methods for expeditious testing. That there can be no such testing, unless a witness is fortuitously in possession of evidence to support a challenge or the government affirms illegality, cannot have been the intent of Congress. The questions may be close, difficult, and controversial; important individual interests are at stake; the need for adversarial development, absent countervailing consideration, is obvious.

We see a clue to treating challenges under (i) and (iii) in our approach to challenges under (ii). Even though the former sections do not, because of the variety of challenges which could be raised under them, limit defenses to facial insufficiency, we see no reason not to analogize and confine scrutiny to what is revealed by the authorizing documents, to test whether they suggest any unlawfulness in authorization or implementation. Balancing the three competing needs—merited secrecy, reasonable expedition, and meaningful defense —we deem the following ground rules to serve best the statutory scheme. There should be an opportunity for inspection of these limited materials: the authorized application of the Attorney General or his designate, 18 U.S.C. § 2516(1), the affidavits in support of the court order, the court order itself, and an affidavit submitted by the government indicating the length of time the surveillance was conducted. No evidence need be provided the defendant for the purpose of litigating the issues of truth of statements made by affiants or the "minimization" of federal officials in monitoring conversations.

If the government does not object upon grounds of harm due to breach of secrecy, the defendant is entitled to access to these materials in order to develop his defenses. If the government interposes an objection on secrecy grounds, the district court must determine whether the secret information can be successfully deleted or summarized and access to the excerpted material granted. *Cf.* 18 U.S.C. § 3500; United States v. Picard, 464 F.2d 215, 220 (1st Cir. 1972). If the district judge, in his discretion, determines that so much of the material is of a sensitive nature that revelation of any of it would prejudice the government, the court must then review this material in camera to determine the constitutional and statutory validity of the application and the court order based on the warrants, and compliance by the government with the court ordered time limits on surveillance. This approach vests the district court with wide discretion. But just as a fit between metals of varying rates of expansion under heat is practically resolved by a resilient gasket, so, we feel, is a sound and sensitive judicial discretion properly relied upon when crisp rulemaking proves intractable.

The orders of the District Court are reversed and these cases are remanded for proceedings consistent with this opinion.